## Schuylkill Navigation Company *against* Farr.

The 150th section of the Act of 14th of April 1834, authorizing each party peremptorily to challenge two jurors in civil cases, does not extend to viewers provided for by the 159th section of the same Act.

In a suit against a canal company for raising a dam whereby the plaintiff's ground was everflowed and damage done to a furnace there being erected, the defendants may, on a cross-examination, ask the plaintiff's witness whether a manager of the company did not inform him of their intention to raise the dam, he being then owner, the defendants stating at the same time their intention to prove the plaintiff's knowledge of this notice; and such notice materially affects the plaintiff's right to recover.

Where testimony is overruled by the court merely as being out of order, the reason for so doing ought to be stated, to prevent misconception and surprise on the party.

Where a cause is remitted from the Common Pleas of one county to a special court in another county, the latter court may discharge a recognizor from his recognizance and receive another surety, for the purpose of making the original one a witness.

Such subsequent recognizor is bound only for subsequent costs, and the first remains liable for costs up to that time, and is therefore interested, unless the recognizance be specially worded.

Though a deed of land is to K. alone, yet F. may have such an equitable estate therein by agreement with K., as to authorize both to sue for damages done to a building erected at the expense of both.

[Schuylkill Navigation Company v. Farr.]

If the legal estate in land is in A., and the equitable estate in B., they may, in Pennsylvania, join in ejectment, or in any action for damage done to the property, though their interest be in unequal proportions.

In a joint suit, such equitable interest, if alleged, must be proved, and it is incumbent on the party to produce any writing relating to it, and to show the respective rights in the property.

The measure of damages occasioned by backing water on land is the difference between what the property would have sold for as affected by the injury and what it would have brought unaffected. The time of estimating the damage is when the injury is complete.

The expense of erecting a furnace is not the measure of damages, but the real value of the property.

Damage done to a tavern stand not mentioned in the narr. cannot be compensated, though it might not have been necessary to file a narr. in the case.

ERROR to the Common Pleas of *Delaware* county, to which the case was removed from *Montgomery* county, and a verdict and judgment there rendered for the plaintiffs, John Farr and Abraham Kunzi. It was a proceeding instituted under the 10th and 11th sections of the Act of 8th of March 1815, incorporating the Schuylkill Navigation Company. (*a*)

---

(*a*) Sect. X. If any person or persons shall be injured by means of any dam or dams being erected as hereinafter mentioned, or the land of any person inundated by swelling of the water, in consequence of the erecting of any dam or dams, or any mill or other water works injured by swelling the water into the tail race of any mill or other water works, which may have been erected in said river, or any stream of water emptying into the same : and if the president, managers and company cannot agree with the owner or owners thereof, on the compensation to be paid for such injury, the same proceedings shall be had as is provided in the 11th section of this Act; the person valuing the damages being first sworn or affirmed, or the jury, as the case may be, shall take into consideration the advantages which may be derived to such owner or owners by the navigation aforesaid.

Sect. XI. That the said president, managers and company shall have power and authority, by themselves or their superintendents, engineers, artists and workmen, to enter in and upon and occupy for the purpose, all land which shall be necessary and suitable for erecting of a lock, sluice or canal, doing as little damage as possible, and then to dig, construct, make and erect such lock, sluice or canal, satisfying the owner or owners thereof; but if the parties cannot agree upon the compensation to be made to such owner or owners, it shall and may be lawful for the parties to appoint six suitable and judicious persons, who shall be under oath or affirmation, and who shall reside within the proper county where the land lies, or if they cannot agree on such persons, then either of the parties may apply to the Court of Common Pleas of the proper county where the land lies, and said court shall award a *venire* directed to the sheriff, to summon a jury of disinterested men, in order to ascertain and report to said court what damages, if any, have been sustained by the owner or owners of said ground, by reason of such lock, canal or sluice passing through his, her or their land; which report, being confirmed by the court, judgment shall be entered thereon and execution may issue in case of non-payment for the sum awarded, with reasonable costs, to be assessed by the court; and it shall be the duty of the jury, or the six appraisers, as the case may be, in valuing any land, to take into consideration the advantage derived to the owner or owners of the premises, from the said navigation passing through the same : *Provided*, That either party may appeal to the court within thirty days after such report may have been filed in the prothonotary's office of

On the 25th of December 1840, referees mutually appointed awarded in favour of the plaintiffs, and both parties appealed.   A narr. was filed, complaining that the plaintiffs were owners of a tract of land containing 32 acres, on which were erected a flouring and grist mill, and were erecting and had nearly completed a furnace for the smelting of iron with anthracite coal, to be propelled by Spring Mill Creek, and that the defendants raised a dam below the mouth of the creek, which caused the water to swell on the lands and mill so that six acres were inundated, the furnace rendered useless, and the water-power and flouring and grist mill greatly injured by reason thereof, and other damages, &c.

The defendants pleaded not guilty, with leave, &c.   On the plaintiffs' application a rule was granted for a special jury and view.

After the jury were sworn, the plaintiffs stated to the court that the deed for the property at Spring Mill had been accidentally left in Philadelphia, but would be produced and given in evidence the next day, and in the meanwhile were allowed to go on with the parol evidence.   The next day the deed was produced, and was from Anthony Williams, the former owner, and wife, dated 1st of January 1839, to Abraham Kunzi, for the 32 acres, excepting and reserving thereout, (in the same manner as in the deed to Williams), to John Potts, his heirs and assigns, the liberty of the said Spring Mill waters, to water certain meadow ground, and also to Jacob and Samuel Paul, their heirs, &c., the same right in common with Potts and others.

The plaintiffs produced a number of witnesses to show that the water was raised about 30 inches by the raising of the defendants' dam, whereby their property was greatly deteriorated in value, the power of the mill reduced, and its custom greatly declined, and the custom of a tavern on the property diminished; that in October 1838, they began to erect there a furnace to smelt iron by anthracite coal, and the different materials and work furnished therefor afterwards, and the cost of the same.

The defendants called witnesses to show that the dam was raised but about 23 inches; that the old dam was leaky and sunk; that the site was unsuitable to an anthracite furnace, and the power insufficient, and that the plaintiffs were so informed by an artist they consulted.

The defendants in the course of their cross-examination of An-

---

the proper county, in the same manner as appeals are allowed in other cases: *And provided also*, That if any person owning land or any other property which shall be affected by this Act, be feme covert, under age, non compos mentis, or out of the State, then and in either of the cases, the president, managers and company shall, within one year thereafter, represent the same to a neighbouring justice of the peace, or to the Court of Common Pleas of the county, as the case may be, who shall proceed thereon in the same manner and to the same effect as is directed by this act in similar cases.

thony Williams, one of the plaintiffs' witnesses, proposed to ask the witness, who had just stated that he knew Joseph T. Mather, formerly a manager of the company, the following question : " Did Mr Mather ever inform you of the company's intention to raise the dam, while you were owner ?" and stated their intention to prove by other witnesses a knowledge of this notice by the plaintiffs. The plaintiffs objected to this question, and the court overruled it, and the defendants excepted.

The plaintiffs called John Righter as a witness. The defendants objected to this witness upon the ground that he was surety for the plaintiffs on their appeal in the court of Montgomery county. The plaintiffs then requested the court to substitute Charles W. Raborg as surety on the appeal in the place of Righter, which the defendants objected to, but the court discharged Righter from his recognizane, and the defendants excepted.

The plaintiffs then again offered John Righter as a witness, and the defendants again objected to him, but the court admitted him, and the defendants excepted.

The plaintiffs (then) asked one of their witnesses, who in the course of his testimony stated that he kept the books of Cress, Righter & Co., and that all the materials that went to the furnace were charged to Farr & Kunzi, " What amount of materials was furnished by Cress, Righter & Co, to Farr & Kunzi for the furnace ?" The defendants objected to this question, but the court allowed it. The witness then stated that the bill of lumber furnished by Cress, Righter & Co. was $481.80$\frac{3}{4}$; of lime $210.12$\frac{1}{2}$; of lime-stone for stack $144.37$\frac{1}{2}$; and $90 more for other work.

The plaintiffs then, after calling a witness who occupied the plaintiffs' tavern, and who stated that he had lived at Spring Mill four years, and had given Farr & Kunzi notice of his intention to remove from the tavern, offered to ask him what was the diminution of power in the mill, the diminution of custom thereto, and the diminution of value of the tavern stand occasioned by the rise of the dam. The defendants objected to this question, but the court allowed it, and the defendants excepted. The witness then stated, " The custom of the mill was double of what it is now. The custom of the tavern was proportionate to that of the mill. I speak of the mill custom ; the custom to the tavern from mill customers. People would come 30 miles sometimes and stay two days before they could get their grist. Before the rise in the dam, the wave caused by passing boats would just come upon the abutment of the towpath bridge. Now there is from 30 to 33 inches upon it; often more."

The defendants offered to challenge Reese Haydock, one of the jury of view. The plaintiffs objected to the challenge, and the court refused to allow it.

The defendants requested the court to charge the jury :

1. That under the declaration and proceedings in this case, the

[Schuylkill Navigation Company v. Farr.]

above plaintiffs cannot recover, the plaintiffs having shown that the title to the premises was vested in Abraham Kunzi alone.

2. That the present plaintiffs cannot recover; because, by their own showing, when the alleged injury was committed, and when these proceedings were commenced, the title to the premises in the declaration and proceedings mentioned was vested by the deed of Anthony Williams to Abraham Kunzi, dated 1st of January 1839, in the said Abraham Kunzi alone.

3. That John Farr has not been shown to have any interest in the above premises, and cannot recover in this case.

4. That if any recovery can be had in this proceeding by these plaintiffs, it must be confined to the damages at the time when the injury complained of was complete.

5. That such recovery must be confined to the actual damages occasioned by the rise of the dam; and that the defendants are not liable for speculative damages, or profits which the plaintiffs might have made, if the dam had not been raised.

6. That such actual damages cannot be applied to the loss of power, in both the grist mill and the furnace, if there was not water to drive both at once.

7. That if the jury are of opinion that the furnace was abandoned from any cause other than the rise in the dam, the defendants are not liable for any alleged injury to the said furnace.

8. That in this case the defendants are not liable for the expense of erecting the furnace.

Charge of the court:

This is a proceeding instituted in pursuance of the provisions of the Act of the 8th of March 1815, incorporating the defendants. The object is to recover damages, and it is admitted the defendants are liable in some sum to the plaintiffs, provided you are of opinion, on the evidence, that the plaintiffs are the owners of the property alleged to be injured by the rising of the Flat Rock dam in the year 1839. On the subject of damages, the only dispute between the parties is as to the amount you ought to award; and this depends, in a great measure, on the question, to what extent was the water-power of the plaintiffs affected by the action of the defendants? Connected with this question, the first disputed fact which presents itself to your consideration is the extent of the height of the new dam above the old. According to all the witnesses examined to this point by the plaintiffs, the increased height of water in the pool, occasioned by the erection of the new breast, is 30 inches. They speak of marks placed at the ordinary height of the water prior to the new erection, which are now, in ordinary water, covered to the depth of 30 inches. If these marks were actually placed at the ordinary water line of that day, their present situation, in reference to the now ordinary water line, unexplained, would be conclusive of the fact alleged by the plaintiffs.

But the defendants assert:

1. That the individuals who made those marks were not competent, by observation and experience, to ascertain the ordinary level of the water. The individuals are John Righter, Francis Hammerback, Peter Righter, Isaac C. Bryant, and perhaps some others. They have given you the grounds on which they affirm their capacity properly to fix these marks.

2. That in 1828 they paid the then owner for all injury occasioned by the damming the water of the Schuylkill on these premises, by the erection of the old dam. So they did; and became, thereby, entitled at all times thereafter, to keep the water up to that height. No subsequent decay or sinking of the breast, by which the water in the pool was lowered, would deprive them of this right. They might have tightened the breast or added to its height, without being subject to answer in damages to anybody, provided that in so doing they did not increase the height of the water in the dam above what it was in the year 1828, when the old breast was perfect. The plaintiffs are, then, entitled to recover for the difference in height between the old breast as it was in 1828 and the new as it stood in 1839. Evidence has been given by the agents of the defendants and others, that actual and accurate measurement shows this difference to be but $22\frac{1}{2}$ inches. This apparent discrepancy between the witnesses of the plaintiffs and those of the defendants may, perhaps, be reconciled by the application of the fact, that for several years prior to 1838–9, the old breast was in a ruinous condition, and permitted the water to escape through its crevices and over its depressions, whereby the general level of the water in the pool was lower than it would have been if the breast had been preserved in its original condition. Perhaps the jury will have no great difficulty on this point; and if the views entertained by some of the witnesses on the effect of subtracting from the "head and fall" of water be correct, it would seem not to be of much consequence, as the difference between 24 and 30 inches is equal only to a half horse power.

The next consideration, when estimating damages, is that the power, as it existed prior to the new erection, was insufficient to drive both mill and furnace. One or the other must have been abandoned; and, therefore, the plaintiffs are not entitled to recover for the destruction of, or injury done to both structures. The alleged injury done to the plaintiffs' furnace will, perhaps, first present itself for determination, because their testimony on the subject of the injury inflicted has been principally directed to the furnace, and it is of this they mainly complain. Was, then, the power in question of sufficient capacity to drive the furnace? If not, there is an end of the question so far as the furnace is concerned, for the defendants cannot be called on to pay for the folly or ignorance of the plaintiffs. On this point you have the testimony of Messrs Johnson and Quimby, who measured the volume of water afforded by the spring, and ascertained that the "head

and fall," before the building of the new breast, was but equal to eleven horse power. The correctness of this measurement and calculation is not denied, as I understand it, by the plaintiffs. As already said, the question is whether this power was sufficient to drive a blast furnace of seven feet boshes? The two witnesses just named are, decidedly, of opinion that it was not, because such a furnace cannot be driven advantageously, or with any profit, under less pressure than two and a half to a cubic inch of air; such a pressure being necessary to produce a blast of sufficient intensity. Mr Quimby says he informed the plaintiffs, before the erection of the furnace, that their power was insufficient for their intended purpose. On the other hand, Messrs Merrick, Lyman and Bryant are of opinion that such a furnace might be carried on successfully under a pressure of one and a half pounds per cubic inch. If this be so, is the remaining power sufficient to drive the furnace? If this question be answered in the affirmative, the measure of damages will be the value of the power deducted, and the expense of changing the situation of the wheel, if that be necessary. Of this, estimates and calculations have been submitted by the defendants.

But if the reduction of the power from eleven horse to nine and a half, by the raising of the dam, destroys it for all useful purposes connected with the furnace, the measure of the damages will be the value of the power destroyed for such purpose, and the amount expended in the construction of the furnace; deducting the actual value of such articles as can be converted into cash, or otherwise profitably disposed of. But if the power remaining to the plaintiffs could be advantageously employed, in connection with another accessible motive power, to drive the furnace, of equal value with water-power, the measure of the damages is the value of the power subtracted, and a principal sum large enough to produce an annual interest sufficient to defray all possible expenses attendant on the employment of the additional power.

If, however, the jury believe that the defendants' position be correct, viz., that the power prior to the erection of the new breast was wholly insufficient to drive the furnace, they will consider what is the extent of the injury done to the plaintiffs' grist mill? In deciding this question you will inquire, what work the mill was capable of doing prior to heightening the dam, and what it can do now? On this point you have the testimony of the millers, who produced memoranda of the work actually done, by which it would seem the capacity of the mill has been decreased one-half. On the other hand, you have proof by others, that the power would only be reduced in the direct proportion which the quantum subtracted bears to the whole " head and fall." Be this as it may, it is certain that the additional rise in the dam causes the water to rise on the mill-wheel so as to impede very materially its speed, especially when there is a more than ordinary

raise of the waters of the river; and it is, probably, owing to this that the mill is so much more affected than it ought to be according to the rule laid down by the scientific gentlemen who have been examined before you. If this be true, can the wheel and gearing of this mill be so altered as to increase its capacity for work, and to what extent? If it can be so altered, the standard of damages will be the value of the power actually lost, which may be measured by the value of the additional work it would have enabled the mill to perform, and a sum sufficient to pay for the necessary alterations and improvements, added to the loss of custom to the tavern-house, occasioned by the reduction of the power of the mill. The rule in these cases is, that such damages are to be given as will put the owner of the property injured in the same pecuniary situation he occupied prior to the injury inflicted.

I have been requested by the defendants to instruct you on certain questions of law, which I proceed to do.

1, 2 and 3. If, at the time of the commencement of this proceeding, the whole property in the premises was vested in Abraham Kunzi, and John Farr had no interest therein, the plaintiffs are not entitled to recover. But although the legal title was in Kunzi alone, yet if, at the time the proceeding was instituted, Farr had an equitable interest in the property, sufficient to constitute an estate, by agreement with Kunzi, of which there is evidence for the consideration of the jury, the plaintiffs may recover.

4. This position is correct, and is accordingly affirmed.

5. The plaintiffs are entitled to recover only for the actual injury to their property caused by raising the dam. The defendants are not liable for speculative damages or profits which the plaintiffs might have made, had the dam not been raised.

6. This proposition has already been given to you as the law.

7. If the jury entertain such opinion, the defendants are not liable for injury done to the furnace. As already said, in such case the inquiry is to be confined to the injury done to the mill and tavern-house.

8. Upon this subject I have already expressed my opinion in the body of the charge, which it is unnecessary to repeat.

Errors assigned:

1. The court below erred in refusing to allow the challenge by the defendants of Reese Haydock, one of the jury of view.

2. In rejecting evidence of notice to Anthony Williams, when owner of the property, of the defendants' intention to raise Flat Rock dam, as stated in the first bill of exceptions.

3. In discharging John Righter from his recognizance as surety on the appeal, as stated in the second bill of exceptions.

4. In admitting the evidence of John Righter, as stated in the third bill of exceptions.

5. In admitting evidence of payments on account of the fur-

nace, made by both John Farr and Abraham Kunzi, after the title to the property had been shown to be in Abraham Kunzi alone, as stated in the fourth bill of exceptions.

6. In admitting evidence of the loss of custom of the mill, and of the loss of custom of the tavern, as stated in the fifth bill of exceptions.

7. In charging the jury that there was evidence from which the jury might find that the title to the property at the commencement of the proceedings in this case, was in John Farr and Abraham Kunzi, and not in Abraham Kunzi alone.

8. In charging the jury that if they were satisfied that John Farr was jointly interested with Abraham Kunzi in the Spring Mill property at the time the proceedings in this case were instituted, the plaintiffs might recover.

9. In charging the jury that " the rule in these cases is that such damages shall be given as will put the owner of the property injured in the same pecuniary situation as he occupied prior to the injury inflicted."

10. In their answer to the first, second and third points submitted by the defendants.

11. In their answer to the seventh point submitted by the defendants.

12. In their answer to the eighth point submitted by the defendants.

The case was argued by *B. Tilghman* and *Meredith*, for plaintiffs in error, and by *W. B. Reed* and *Williams, contra.*

The opinion of the Court was delivered by

ROGERS, J.—This was originally a proceeding in the Court of Common Pleas of Montgomery county, under the 10th and 11th sections of the Act of the 8th of March 1815, incorporating the Schuylkill Navigation Company. Referees were appointed under the Act, who, on the 25th of December 1840, awarded in favour of the plaintiffs the sum of $9300. Both parties appealed, and on application of the defendants, the cause was removed into the Court of Common Pleas of Delaware county. The plaintiff entered into a recognizance with John Righter, surety, in the sum of $500, to prosecute, &c., the appeal. The suit is brought to recover damages for an injury to the property of the plaintiffs by raising a dam at Flat Rock; and on the trial the plaintiffs declare that at the time of the injury, &c., they were the owners of a certain tract of land, &c., bounded by lands of John Righter and others, containing 32 acres more or less, on which were erected a flouring and grist mill, and on which the plaintiffs, at the time of committing the said grievances, &c., were erecting and had nearly completed a furnace intended for the smelting of iron with anthracite coal, and to be propelled by the waters of a stream called " Spring Mill

creek," &c. That the defendants raised a dam called "Flat Rock dam," which caused the water to swell upon the lands and mill of the plaintiffs, so that a large portion of the tract, viz: 6 acres, was inundated, and the furnace rendered entirely useless, and the water-power and flouring and grist mill were greatly injured. The defendants pleaded not guilty.

On the application of the plaintiffs, a rule was granted for a special jury and view, which was accordingly had, and on the trial the defendants offered to challenge one of the jury of view. The challenge was overruled, and this is the first error. This point would seem not to be an open question since the case of *Schwenk* v. *Umsted*, (6 *Serg. & Rawle* 351). At any rate, weakened as we are by the absence of two of our brethren, it would be, unjustifiable in us to attempt to overrule it. It is there decided, that the Act of the 4th of April 1809, which authorizes each party to challenge peremptorily two jurors in all civil cases, does not extend to viewers, provided for by the 11th section of the Act of 29th of March 1805. This decision was made in the year 1821, and of course the construction given was known to the legislature when they passed the Act of the 14th of April 1834. The only difference between them is, that in the 11th section of the Act of 29th of March 1805, the words are "allowed challenges," and in section 159 of the Act of 1834, it is "challenges allowed." The words are substantially the same, the collocation only being slightly changed. So also the 150th section of the Act of 1834 is a literal transcript of the 2d section of the Act of the 4th of April 1809. If any inconvenience had arisen from the former construction, the legislature would no doubt have given a remedy when the matter was again brought before them.

The plaintiffs having proved by Anthony Williams that he was at one time the owner of the Spring Mill property, and that Joseph T. Mather was formerly a manager of the Schuylkill Navigation Company, the defendants offered to ask the witness on his cross-examination the following question: "Did Mr Mather ever inform you of the company's intention to raise the dam while you were the owner?" and at the same time stated their intention to prove by other witnesses a knowledge of this notice by the plaintiffs. The evidence, as is admitted, was objected to on two grounds—1st, That the evidence was in itself inadmissible; and, 2d, That it was testimony in chief, and consequently he was not at liberty before he opened his case to introduce it to the jury on a cross-examination of the witnesses. *Ellmaker* v. *Buckley*, (16 *Serg. & Rawle* 72). The court overruled the evidence, but upon which point does not appear. As this cause goes down for another trial, the second objection would seem to be immaterial, although it would appear to me but right, as a matter of practice, that where evidence is rejected for the last reason, it should be stated, for otherwise the party may be taken by surprise, being uncertain for what cause

[Schuylkill Navigation Company v. Farr.]

the testimony is overruled. It must be taken, that the party can prove what he alleges, and it is certainly no answer to say that he neither proved nor offered to prove it in a subsequent stage of the cause. If the court rejected the testimony for the first reason, why should he again introduce it to the attention and receive a merited rebuke from the court for again troubling them with a question which may have been before decided? Where the court rules the point generally, the party has a right to consider the question decided on both grounds, and may, if he chooses, dismiss the witnesses by whom he was prepared to prove it; and this, for aught we know, may have been the case here. Either party may require the court to state for which reason it is rejected, and where this is distinctly announced, I suppose we shall rarely hear of a bill of exceptions where the decision is only as to the order in time of introducing the testimony.

But, independent of the objection to the time, was the evidence admissible? I am clearly of the opinion that it was. A notice was given to the then owner of the land, that it was the intention of the company to raise their dam, as they had clearly a right to do by their charter. Of this the plaintiffs were informed before they erected their furnace; and if so, they would be entitled to little if any damages, being aware that, for all practical purposes, the intended erection must be destroyed, or its value greatly impaired, by the proposed alteration of the dam. It would be their own folly to proceed with their work when put upon their guard by a notice that the company intended to improve the navigation in the manner stated, a right to which they are unquestionably entitled under their charter. If the knowledge of this fact was brought home to them, they, as prudent persons, would be bound to ascertain precisely the intentions of the company as to the proposed alteration in the height of the dam. For, suppose Williams, who was the owner of the premises at the time, had gone on to erect a furnace in defiance of the notice, would it not most materially affect his right to compensation by reason of the alteration in the height of the dam? And there can be no difference between Williams and the present plaintiffs, provided the notice is traced to them.

3d and 4th errors. That the court erred in discharging John Righter from his recognizance, and in permitting him to give evidence. I would remark that there is no difference in regard to their power to discharge the recognizor between the courts of Delaware and Montgomery. The cause is remitted from the latter to the former, to be proceeded in in like manner and subject to the rules and proceedings as if it had remained in the court in which it was originally commenced. Now, that the court of Montgomery county had the right to discharge the recognizor, and admit him as a witness in the cause by the substitution of another recognizance equally good, cannot be doubted. It is the common every-

day practice, and must sometimes be resorted to, to prevent a failure of justice. Of this the appellee cannot complain, because the court must be careful not to impair or diminish his security; for the latter recognizance must be a complete substitute for the former. It is only on that condition that the court has the right to discharge one recognizor and substitute another. If, therefore, here, as is contended, the last recognizance only binds the recognizor to pay all costs that shall accrue after the date of the recognizance in consequence of the appeal, the first recognizor will be liable for the costs that accrued before that time. This would leave him liable to such an interest in the event as would be a decisive objection to his competency. Without undertaking to determine whether that is the case here, because it is clearly unnecessary as the cause will be re-tried, I think it but proper to say that the defendant has a right to something more precise and definite, and less liable to difficulty and dispute, than the substituted recognizance. I would therefore recommend the party to amend his recognizance, or substitute another not liable to any objection.

5th error. The court below erred in admitting evidence of payments on account of the furnace made by both John Farr and Abraham Kunzi after the title to the property had been shown to be in Abraham Kunzi alone. This point is argued in connection with the charge of the court on the first, second, and third points, viz: " That under the declaration and proceedings in this case, the plaintiffs cannot recover, having shown that the title to the premises was vested in Abraham Kunzi alone. That the present plaintiffs cannot recover, because, by their own showing, when the alleged injury was committed, and when these proceedings were commenced, the title to the premises in the declaration and proceedings mentioned was vested by the deed of Anthony Williams to Abraham Kunzi, dated the 1st of January 1839, in the said Abraham Kunzi alone. That John Farr has not been shown to have any interest in the above premises, and cannot recover in this case."

The three points are substantially the same. The case shows that after the introduction of the deed to Kunzi alone, the defendant took the earliest opportunity to object to evidence of any expenses for the furnace paid by Farr & Kunzi; and, in answer to the points, the court instructed the jury, that " if, at the time of the commencement of the proceeding, the whole property in the premises was vested in Abraham Kunzi, and John Farr had no interest therein, the plaintiffs are not entitled to recover. But, although the legal title was in Kunzi alone, yet if, at the time the proceeding was instituted, Farr had an equitable interest in the property sufficient to constitute an estate by agreement with Kunzi, of which there is evidence for the consideration of the jury, the plaintiffs may recover."

In this I cannot say the court is in error. If Farr had such an equitable interest as constituted an estate, there is no valid objection to his joining in an action to recover damages for an injury to the estate with the owner of the legal title. Thus, if the legal title is alone in A., but the equitable title in A. and B., A. and B. may join, either in an ejectment or in an action to recover damages for an injury to the property of which they are joint owners, and it is of no consequence that they are the owners in unequal proportions; as for example, that the one should be the owner of three-fourths, and the other of one-fourth. The equitable title, for many purposes in Pennsylvania, where we have no Court of Chancery, is treated in the same manner as the legal title; equity considering that as done which a Chancellor would decree to be done. For this reason the owner of the equitable title may support ejectment, and it is sufficient in Pennsylvania to recover upon in partition. 7 *Serg. & Rawle* 467.

But the court say there was *some* evidence of title in Farr, and this we cannot gainsay. In the correspondence between Farr and Kunzi, which took place before the suit, the title in Farr is recognized by Kunzi. Thus, in the letter of the 9th of August 1839, from Farr & Kunzi to the company, there is, among other things, this language: " Compelled, therefore, to look elsewhere for the power *we* wanted, and having satisfied ourselves that the water at Spring Mill was sufficient and never failing in its supply, *we* (that is, Farr & Kunzi) made purchase of that property expressly for the power." Indeed, the whole correspondence shows that there was an interest of some kind in Farr in the Spring Mill property, and as between them a court of equity would decree a conveyance or a declaration of trust. But this is a contest between them claiming as owners, and a third person, and I would suggest whether, in this case, something more definite as to Farr's interest is not required on another trial than has been disclosed by the evidence already adduced. It strikes us with surprise that there is no written memorandum between these parties; and if there is, the inquiry is a very natural one, why is it withheld? Does the interest extend to the whole property, or is it confined to a part of the property, the furnace, for example? Has Farr an interest in the mill? has he an interest in the tavern? or is his interest, as in a mercantile concern, the title to the property in the whole, or in a greater part being in Kunzi alone? This, we say, on another trial, the defendants have a right to demand, shall be distinctly proved. For, it is very plain, that in a joint suit, the plaintiffs, can only recover for the injury done to the joint property. Has Farr an interest as tenant for life, or for years? All these are matters of inquiry which may be pertinent on the second trial. And these inquiries are more natural, if, as suggested heretofore, they, together with the deed to Kunzi, have been carefully kept out of view. In the declaration they allege they are joint owners, and this it is incumbent on them to prove.

6th error. "That the court erred in admitting evidence of the loss of custom of the mill, and of the loss of custom of the tavern, and in their charge on these points; and, in connection with this, in admitting evidence and charging the jury that the defendants were answerable for the expenses in building the furnace." In answer to the defendants' fifth point, the court say, "the plaintiffs are entitled to recover only for the actual injury to their property caused by raising the dam. The defendants are not liable for speculative damages or profits which the plaintiffs might have made had the dam not have been raised." This is all very correct. But the court, after having admitted evidence of what was the diminution of power in the mill, the diminution of custom thereto, and the diminution of value of the tavern stand occasioned by the rise of the dam, further instruct the jury, that "the standard of damages will be the value of the power actually lost, which may be measured by the value of the additional work it would have enabled the mill to perform, and a sum sufficient to pay for the necessary alterations and improvements, added to the loss of custom to the tavern-house, occasioned by the reduction of the power of the mill." So also, after admitting evidence of expenses incurred in erecting the furnace, the court in substance instruct the jury that the defendants are liable for those expenses.

The rule of estimating damages in a case like the present, is clearly given in *The Schuylkill Navigation Company* v. *Thoburn*, (7 *Serg. & Rawle* 411). In estimating damages, the jury are to value the injury to the property at the time the injury was suffered, without reference to the person of the owner or the state of his business; and the measure of such damages is the difference between what the property would have sold for as affected by the injury, and what it would have brought unaffected by such injury. It is unlike a nuisance, for the continuance of which repeated actions may be brought, in which damages may be recovered for the time intervening between the inception of the preceding suit, and the impetration of the writ in the cause, which is then tried. The compensation is to be prospective, as well as retrospective, but to be estimated with reference to the time when the injury was committed. It was in fact to be the price of a privilege to swell the water to a particular height for an indefinite time. Now the price was due the moment the privilege was entered upon and the price could be ascertained; which was obviously the time when the obstruction was first completed. The jury were, therefore, to ascertain what was then due; and the amount clearly could not be enlarged, or in any way affected by subsequent injuries, the consequences of the obstruction. The present Chief Justice, who delivered the opinion of the court, then enters into an argument showing the danger of taking into consideration circumstances posterior to the time when the privilege is fully entered on, and its consequences to the individual to be compensated are fully as-

certained.  The time of estimating the damages is when the in-
jury complained of was complete, which was the moment the
dam was finished, or rather when the obstruction by swelling the
water permanently produced its most injurious consequences.
This case has since been recognised in *Shrunk* v. *The Schuylkill
Navigation Company*, (14 *Serg. & Rawle* 71), and in *The Schuyl-
kill Navigation Company* v. *Freedley*, (6 *Whart.* 111).  Instead of
adhering to the safe rule here laid down, the court admitted evi-
dence of what is said to have been a consequence arising from
swelling the water on the plaintiffs' property, viz., the diminution
of the custom of the mill, and the diminution of the value of the
tavern-stand, arising from the same causes.  And this is not used
for the purpose of ascertaining the decreased value of the pro-
perty at the time of the completion of the injury, but in the charge
of the court, as a substantive ground of damages.  If the dimi-
nution of custom in the mill and tavern was the immediate or
necessary consequence of the alteration of the dam, I will not say
it might not be used as a means of ascertaining the extent of the
injury.  The loss occasioned by the obstruction must, after all, in
a great measure, be a matter of opinion, and perhaps the witness
might be permitted to state that, among other things, as the rea-
son for his opinion.  It is obvious, however, that it must be re-
ceived and used with great caution, and in strict subordination to
the rule in *Thoburn's Case*, which is, that the measure of damages
is the difference between what the property would have sold for
as affected by the injury, and what it would have brought unaf-
fected by such injury.

In connexion with this part of the case, I will now notice the
admission of the evidence and charge of the court in respect to
the expenses in erecting the furnace.  The injury done to the fur-
nace would seem to have been the principal ground of the plain-
tiffs' complaint.  Anything, therefore, that relates to that point
cannot be overlooked.  On this point, we are of opinion that the
court was in error.  If the measure of damages is the injury done
to the property, estimated by its decreased value, then it is plain
that the defendants cannot be made to pay for the expenses of erect-
ing the furnace, which *may* have greatly exceeded the real value
of the property after it was completed.  It is the value immedi-
ately before and after the completion of the obstruction, which is
the criterion, and not the expense of putting the buildings upon
the property.  Suppose we reverse the rule, would the plaintiffs
be content, if it had so happened that the furnace, from peculiar
circumstances, was put up at a very reduced price, to have had
it valued accordingly, notwithstanding in the mean time every-
thing had been greatly enhanced in price?  The defendants are not
bound to pay for the blunders or even taste of the plaintiffs in
erecting their furnace, as it may and frequently has happened that
in consequence of it large sums of money have been squandered

in unnecessarily costly buildings. The same remark is also strictly applicable, since the expenses in building the furnace seem to have been considered by the court, and of course by the jury, as a substantive ground of damages, and not as a means of estimating the amount of injury the plaintiffs sustained by the erecting or raising the dam.

The evidence in relation to the diminution of the value of the tavern-stand is liable to another objection. In the declaration the injury is laid to six acres of land, to the furnace, the water-power and flouring and grist mill; but the tavern-stand is not mentioned, nor is there any reference *eo nomine* to it. If, then, the plaintiffs can recover damages for an injury to the tavern, it must be under the *alia enormia*. And it is true that under the allegation of *alia enormia* some matters may be given in evidence in aggravation of damages, though not specified in any other part of the declaration. Thus, in trespass, for breaking and entering a house, the plaintiff may, in aggravation of damages, give in evidence the debauching of his daughter, or the battery of his servants, under the general allegation *alia enormia;* but he cannot, under the *alia enormia*, give in evidence the loss of service, or any other matter, which *would of itself bear an action*, for if it would, it should be stated specially, and therefore, in trespass, *quare clausum fregit*, the plaintiff would not, under the above general allegation, be permitted to give evidence of the defendant's taking away a horse. *Bull. N. P.* 89; *Holt.* 699; 6 *Mod.* 127; 1 *Sid.* 225; 2 *Salk.* 643; 1 *Str.* 6. Under the above rule, if it could be shown by the plaintiffs that the tavern was an appurtenant to the mill or furnace, the evidence, if in other respects proper, might have been received. But this is not pretended, for the furnace and mill are as much appurtenants to the tavern, as the tavern is appurtenant to them. The injury to the tavern would itself have borne an action, and for this reason it must be stated specially. It is nothing to the purpose that the cause might have been tried without a declaration. The plaintiff thought proper to file a declaration, and to allege injury to property, which he has described. To permit him to ask damages for other property not named, would take the defendants by surprise, as the defendants could not come prepared to resist a claim which was not made.

As to the reservation in the deed from Williams to Kunzi, we are not called on to express an opinion, inasmuch as it was not, for some reason, brought to the attention of either court or jury. The omission, no doubt, will be corrected on another trial, where it must have an important bearing on one part of the case, viz., the damages to which the plaintiffs may be entitled for the injury done to the furnace.

Judgment reversed, and a *venire de novo* awarded.