# Graff *versus* The Pittsburgh and Steubenville Railroad Company.

A subscription to the stock of a railroad company, creates a debt against the subscriber from which he cannot relieve himself by an assignment or transfer made without the sanction of the directors.

Railroad Company *v.* Clarke and Thaw, 5 *Casey* 146, affirmed.

Evidence of the loss of a subscription book, or other document, so as to let in secondary evidence of the fact of subscription, is for the court and not for the jury.

Proof of diligent search and inquiry by the proper custodian, is sufficient to let in secondary evidence, unless the book be traced to other hands.

Corporation books, though not generally evidence against a stranger, are so against a corporator, present and assenting to the entries made in them.

It is not error to pronounce on the effect of evidence, where it is such that it would be the duty of the judge to set aside the verdict, if rendered against it.

If a party admit himself to be a subscriber, and on the faith of such admission others have acted for his benefit, he will be estopped from subsequently denying that he did in fact subscribe.

A subscriber, sued for the amount of his subscription, cannot set up as a defence that his subscription was a feigned and fraudulent one, and that the company was a party to the fraud.

A subscription to a joint stock is not only an undertaking to the company, but with all other subscribers ; and even if fraudulent as between the parties, is to be enforced for the benefit of the others in interest.

ERROR to the District Court of *Allegheny county.*

[Graff *v.* The Pittsburgh and Steubenville Railroad Co.]

This was an action of *assumpsit* by The Pittsburgh and Steubenville Railroad Company against Elizabeth Graff, executrix of Henry Graff, deceased, to recover $5000, for one hundred shares of the stock of the said company, subscribed for by the said Henry Graff, in his lifetime. The defendant pleaded *non assumpsit*, and payment with leave, &c.

On the trial, the plaintiffs called S. F. Von Bonnhorst, who testified as follows:—

"I am secretary of the Pittsburgh and Steubenville Railroad Company; have been since January 1855; I have the control of all the books and papers of the company, and have made most diligent search for all the original subscription books to the stock of the company, and especially for the one that I supposed contained the subscription of Henry Graff in connection with others, but could not find it; I have inquired of parties connected with the company prior to my time, for such a subscription book, and all the information I could get, was, that such a book had been in existence, but I could get no clue to its whereabouts; I made inquiry of every person that I supposed would have any knowledge of the matter. This is the minute book of the Pittsburgh and Steubenville Railroad Company. I understood from Mr. Hill that there was such a book; he was treasurer of the company and a stockholder.

"I understood it from Mr. Woods, the former president, that there was a book containing the subscription of the canal men, Bingham & Co., Henry Graff, Clarke & Thaw, and Hays & Black, and Mr. Woods said he subscribed in his own handwriting to the stock of the company, but there is no such book in the possession of the company; I inquired of Captain Naylor, the former secretary, he said there was such a book, and insisted that it was in the possession of the company; but no such book could be found; he resides at Washington City."

The plaintiffs then offered secondary evidence, the nature of which is fully set forth in the opinion of the court, to prove:—1. That Henry Graff did subscribe for 100 shares of the stock of the Pittsburgh and Steubenville Railroad Company. 2. That he was estopped from denying that he had so subscribed. This evidence was admitted by the court, and excepted to by the defendant.

The defendant offered evidence to prove that she was entitled to a credit of $4000 for 80 shares of stock transferred by her testator to E. M. Stanton. The court below ruled out this evidence, and sealed another bill of exceptions.

The defendant's counsel submitted the following points, upon which they requested the court below to charge the jury:—

"1. That the transfer of stock held by an original subscriber in a railroad company, indebted to said company in no other

[Graff v. The Pittsburgh and Steubenville Railroad Co.]

manner than by his subscription for such stock, and who at the time of such transfer has promptly met and paid all calls for payment on such stock, when such transfer is made on the books kept by the company for that purpose, in person, or by attorney duly authorized, in the presence of the president or treasurer of such company, without objection by such president or treasurer of such company, the consent of the board of directors of such company to such transfer may be legally implied or inferred by the jury from such facts, and such transfer is valid and legal, and discharges such original subscriber from all further liability arising from such subscription.

" 2. That the act of the treasurer suffering such transfer to be made is valid and sufficient evidence of the assent of the board of directors to such transfer.

" 3. That the transfer of stock, under the circumstances enumerated in the two preceding points, will have the effect of discharging liability incurred by the owner thereof prior to such transfer.

" 4. That stock subscribed for and not paid up, and not due or called for, is such a liability as would be discharged by such transfer.

" 5. That the evidence in the cause does not sustain or prove the material allegations in the plaintiffs' declaration, and that the plaintiffs are consequently not entitled to recover.

" 6. To make out the case under the pleading, plaintiffs must prove to the satisfaction of the jury, that Henry Graff was an original subscriber in the books of the commissioners for one hundred shares of stock. It is not enough to show that he was a holder of that amount of stock.

" 7. Unless the jury believe that the original contract and undertaking of Graff was to and with the Pittsburgh and Steubenville Railroad Company, and not a mere promise to subscribe so many shares for the purpose of connecting Pittsburgh by a railroad with the Steubenville and Indiana Railroad Company, their verdict should be for the defendant.

" 8. If the jury believe that the lists of subscribers and stockholders made out and exhibited from time to time, to the governor of the Commonwealth, and to the mayor of the city of Pittsburgh, for the purpose of obtaining a charter from the governor, and a subscription of stock from said city, were not bonâ fide and truthful transcripts from the books of the commissioners and the treasurer, representing actual subscriptions and payments on account of the capital stock—made and received in pursuance of law—such lists and such exhibitions and use of them were fraudulent ; and whether Henry Graff was a party to such frauds or not, the plaintiffs, being a party, cannot make use of them here for the purpose of recovering against the defendant."

[Graff *v.* The Pittsburgh and Steubenville Railroad Co.]

The court below (WILLIAMS, J.) declined so to charge, and instructed the jury, that, upon the authority of the case of The Pittsburgh and Steubenville Railroad Company *v.* Clarke & Thaw (erroneously reported in 5 *Casey* 146, as The Pittsburgh and Connelsville Railroad Company *v.* Clarke & Thaw), *a case in all respects like the present,* the plaintiffs were entitled to recover.

To this charge the defendant excepted; and a verdict and judgment having been rendered for the plaintiffs for $5745.23, the defendant removed the cause to this court, and here assigned for error: 1. The admission of secondary evidence of the subscription of Henry Graff. 2. The rejection of the evidence of the transfer of 80 shares to E. M. Stanton. 3. The refusal to charge as requested in the points presented by the defendant.

*Shinn & Loomis,* for the plaintiff in error.—It appears to us impossible to sustain the charge of the court below. The judge was totally mistaken in saying that the case in 5 *Casey* 146 was in all respects like the present. In that case the defendants pleaded payment only. The original liability was not denied. In this the averment of a subscription by Henry Graff was denied by a direct negative plea. Upon the traverse of this averment arose the principal struggle before the jury, and this question was taken from them by a binding instruction.

Upon the other points, the counsel cited the case of the Thames Tunnel Company, 6 *B. & C.* 341; *Angell & Ames on Corporations,* §§ 679, 635, 513, 516; Buffington *v.* The Turnpike Company, 3 *Penn. Rep.* 71; West Philadelphia Canal Co. *v.* Innes, 3 *Wh.* 206; Commonwealth *v.* Cullen, 1 *Harris* 139; Latapee *v.* Pecholier, 2 *Wash. C. C. R.* 184; see also Evans *v.* Mengel, 1 *Barr* 68; Hamilton *v.* Moore, 4 *W. & S.* 570; Richabaugh *v.* Dugan, 7 *Barr* 395-6; Buddicum *v.* Kirk, 3 *Cranch* 293-8.

*Craft* and *Hamilton,* for the defendants in error.—The secondary evidence was properly admitted: Witter *v.* Latham, 12 *Conn.* 392; Bouldin *v.* Massie, 7 *Wheat.* 122; Leazure *v.* Hillegas, 7 *S. & R.* 323; Braintree *v.* Battles, 6 *Verm.* 395; United States *v.* Reyburn, 6 *Pet.* 352; *Greenl. Ev.,* § 558, note 3; Mauri *v.* Heffernan, 13 *Johns.* 58, 74; Thomas *v.* Harding, 8 *Greenl.* 417; Corbin *v.* Jackson, 14 *Wend.* 619.

The documentary evidence was pervaded throughout with the characteristics of an estoppel: 9 *Wend.* 274; 9 *Cow.* 274; 5 *Met.* 381; 10 *Barr* 530; 6 *Casey* 81: and this court will *not* reverse for an error by which the defendant could not have been prejudiced: Bunting *v.* Young, 5 *W. & S.* 188; Johns *v.* Battin, 6 *Casey* 87; Gast *v.* Porter, 1 *Harris* 533; Morgan *v.* Weir, 1 *Casey* 119.

[Graff v. The Pittsburgh and Steubenville Railroad Co.]

The opinion of the court was delivered by

WOODWARD, J.—That a subscription to the stock of a railroad company creates a debt against the subscriber, from which he cannot relieve himself by an assignment or transfer made without the sanction of the directors, is a proposition so reasonable and just, and was so fully vindicated by C. J. LEWIS in the case of this same company against Clarke & Thaw, 5 *Casey* 146, that it would be a waste of words to discuss it.

The transfer set up in this case is the very same that was condemned in that. Were we expected to hold it a nullity as to one subscriber and valid as to another? If there was some diversity of opinion on the point, as presented in the case of Everhart v. The Philadelphia and West Chester Railroad Company, 4 *Casey* 339, there was none in Clarke & Thaw's case, and the judgments, absolutely coincident in those cases, are decisive against the present plaintiff in error.

But the *fact* of a subscription by Henry Graff was the point in issue here. The plaintiffs alleged that he did, on the 14th July 1851, make a subscription, in his own handwriting, on the books of the commissioners appointed by law to receive subscriptions, of and for one hundred shares of the capital stock of said company, at fifty dollars for each share, amounting in all to five thousand dollars, and promised to pay the said amount from time to time as called for. The plea of *non assumpsit* put this fact directly in issue, and the plaintiff in error complains that the court admitted improper evidence to support it, and finally withdrew it from the jury, to whom the right of decision belonged. It must be admitted, that the pleadings distinguish this case from that of Clarke & Thaw. There the plea was payment, and the question turned on the effect of the alleged assignment of 80 shares to Mr. Stanton. Here the same assignment is in question, and we dismiss it by referring to what was said of it in that case; but the plea of *non assumpsit* denies the subscription which was admitted there.

If the learned counsel have succeeded in convicting the court of an error when they spoke of that case, as in "*all respects*" like the present, it does not necessarily follow that the judgment is to be reversed, for, though the cases differ as they stand upon the pleadings, the judgment here may have been right.

The fact that Graff subscribed for one hundred shares of stock, was to be proved, like other facts, by the best evidence in the power of the plaintiff to produce. The subscription book, accompanied with proof of the handwriting, would have been the natural and proper evidence. But the subscription book was lost. This was a fact to be ascertained and decided by the court, as a preliminary to the introduction of secondary evidence. The evidence of the loss was addressed to the court, and not to the jury. It was

[Graff *v.* The Pittsburgh and Steubenville Railroad Co.]

intended to inform the conscience of the court, that they might decide whether secondary evidence of the subscription were admissible. And when the secretary of the company swore that he had the control of all the books and papers of the company—that he had made most diligent search for the original subscription books, but could not find them, and had inquired of every person connected with the matter, but could get no clue to them, it was not error in the court to adjudge them lost. The presumption of law always is, that books and papers will be found where they ought to be, and when the legal and proper custodian swears that after diligent search and inquiry he cannot find them, sufficient ground is laid for the introduction of secondary evidence. If the evidence trace them into other hands, inquiry must be directed thither; but here there was no such evidence, and, therefore, no such further inquiry was necessary.

A fair case was thus presented for resorting to secondary evidence of Graff's subscription, and what was that evidence? 1st. The letters patent, dated July 22d 1851, reciting full compliance with the stipulations, conditions, and things in the acts incorporating said company directed to be performed, and constituting the subscribers to the stock of said company a body corporate, among whom Henry Graff is named as a subscriber of one hundred shares. 2d. The first meeting of the Board of Directors, on the 28th August 1851, Henry Graff being present as a director, at which the letters patent were produced and ordered to be copied at large on the minutes, and filed among the records of the company. 3d. Meeting of 4th December 1851, Graff present, at which the report of the commissioners, containing a list of subscribers, among whom was Henry Graff, for 100 shares, was ordered on the minutes. 4th. Organization of the new board on the 13th January 1852, Henry Graff being present as a newly-elected director. 5th. Minutes of meetings, June 3d, July 1st, and November 12th 1852, at which instalments on the stock were called in—Graff present. At the meeting of 12th November 1852, Mr. Graff was elected president of the company, to fill the vacancy occasioned by the resignation of Mr. Moorhead, "whereupon Mr. Graff took the chair, and thanked the board for the honour they had conferred on him." 6th. August 12th 1852, the appointment of a committee, on motion of Mr. Graff, to act with the president and secretary, in relation to the procurement of the city subscription of $250,000, and the appointment of Mr. Graff on that committee. 7th. The special meeting of October 4th 1852, at which the committee made report of the city subscription in connection with the deposition of Mayor Guthrie, explaining the circumstances under which the subscription was made, and the agency of Mr. Graff therein.

Without adverting to all of the minutes in evidence, were not

[Graff *v.* The Pittsburgh and Steubenville Railroad Co.]

these sufficient to prove Graff a subscriber? It is said, they only prove that he was a stockholder, and not an original subscriber.

That was exactly the distinction on which Mayor Guthrie first refused, very prudently, to make the subscription on behalf of the city. He was furnished with a list of *stockholders*, but he wanted, and the committee filed with him, a list of *subscribers*. Mr. Graff, participating actively in all these proceedings, thus put on record his most emphatic admission that he was a subscriber. So, also, when he accepted and recorded the letters patent, and the report of the commissioners; for these were founded, and were required by the Acts of Assembly to be founded, on actual *bonâ fide* subscriptions. Mr. Graff knew this, and it would be an unwarrantable imputation on his intelligence, to suppose that he did not mean to stand recorded as an original subscriber. Observe, the fact under inquiry was not, whether he was liable for twenty or one hundred shares, but whether he had subscribed at all. The extent of his liability depended on the effect of the assignment to Stanton, but the *fact* of liability on his actual subscription. And it was to this point alone, all this evidence was directed. In the absence of all proof of a derivative title to his stock, this mass of evidence was overwhelming. Whether by his own right hand, or by an authorized agent, he made the subscription, he made it. Else, why did he hold himself out to the governor, the mayor, and the world at large, as a subscriber? Why did he pay six several instalments on 20 shares, if he was not a subscriber? Why did he attempt to assign 80 shares to Stanton, and after that act as director and president of the company, if he had not indeed subscribed? How came he by the stock which stands on the books to his credit, and in respect of which he acted as an officer of the company? He did not obtain it by assignment from some other subscriber, or that would have been shown. And yet he held it, and exercised acts of ownership over it, and induced others to subscribe by his example and influence.

Now, if the fact of subscription was susceptible of proof at all by secondary evidence, here were circumstances that speak trumpet-tongued in favour of it; circumstances more definite and conclusive in their nature than those which have condemned many a man to the gallows. The corporation books, though not generally evidence against a stranger, are so against a corporator present and assenting to the entries made in them: 4 *W. & S.* 373. They were properly admitted against the defendant, for the letters patent were *primâ facie* evidence that he was a corporator; and, taken in connection with his acts and declarations, they persuade irresistibly to the conclusion that he was a subscriber. Yet, it is persistently argued, that all this was inadequate evidence of subscription, or at the least, that it should have been submitted to the jury, and not passed upon by the court. Had there been any evidence that Graff

[Graff *v.* The Pittsburgh and Steubenville Railroad Co.]

obtained his stock otherwise than by subscription, all the evidence should have gone to the jury. The necessary inferences from the whole body of proofs, would have belonged to them to deduce. But there was no other evidence of his title to the stock than that which was given by the plaintiff, and that was all documentary, except Guthrie's deposition. Guthrie's veracity was unquestioned; his testimony was in writing, and the material facts stated by him were inferrible also from the minutes of the company which Graff had assisted to make up. Under these circumstances, it was no error in the court to pronounce on the effect of the evidence. Had it gone to the jury, and a verdict been rendered against such preponderating proofs, the court would have been bound to set it aside. And when it is the duty of a judge so to control the verdict, he is not to be reversed for exercising his authority in advance of the verdict, and saving thereby the delay and expense of a new trial.

Conclusive presumptions of law are always for the court to declare, and not for the jury; and among these are *admissions* of the party charged, which Mr. Greenleaf divides into two classes —first, solemn admissions, or admissions *in judicio*, which have been solemnly made in the course of judicial proceedings; and, secondly, unsolemn admissions, *extra judicium*, which have been acted upon, or have been made to influence the conduct of others, or to derive some advantage to the party, and which cannot afterwards be denied without a breach of good faith. And this latter class comprehends not only all those declarations, but also that line of conduct by which the party has induced others to act, or has acquired any advantage to himself. And these admissions may be pleaded by way of estoppel *en pais*. And it makes no difference in the operation of the rule whether the thing admitted were true or false, it being the fact that it has been acted upon that renders it conclusive: 1 *Greenleaf Ev.*, § 27, 207–208.

This doctrine was applied in the case of the Cromford and High Parke Railway Co. *v.* Lacey, 3 Younge & Jervis, p. 79 (Exchequer), not only in a manner that fully justifies the ruling below, but which takes away the force of the argument founded on the case of The Thames Tunnel Company *v.* Sheldon, 6 *Barn. & Cresswell* 341. The attempt there was to escape from liability for a subscription of stock, on the ground that no original contract had been signed, which bound the defendant and *his heirs*, and therefore, that the Act of Parliament incorporating the company, and containing a recital of such a subscription, was founded on a misrecital. In England, it is probably well known, the company is formed and the stock subscribed before the act of incorporation is obtained, and hence the alleged misrecital involved the very question whether anything short of an actual signature of a contract could constitute a subscription. There, as here, the Thames

[Graff v. The Pittsburgh and Steubenville Railroad Co.]

Tunnel case was relied on; but the whole court concurred in holding that it did not apply, and that the acts of the defendant in paying instalments, and holding himself out to the world as a proprietor, estopped him from denying his subscription. "It is impossible to say," observed the Lord Chief Baron, "that many individuals may not have been induced to subscribe under the influence of his example. He has acted and held himself out to the world as a proprietor, and after such conduct cannot now say that he is not a proprietor, or question the validity of the Act of Parliament, which by his conduct he has adopted." And by HULLOCK, B., "It is said, that he is only a proprietor, who has signed a contract binding his heirs. But, upon the facts of the case, no doubt can be entertained that the defendant is a proprietor. Upon what other ground does he pay his calls? What other reason can be suggested for his conduct—and what other inference can be drawn from his acts? *I think that by his conduct he has admitted his character as proprietor, and has estopped himself from disputing that fact.*"

In the case before us, the court did no more than was done in the above cited case, on far lighter grounds—estop the party from denying a fact which he had so often and so variously asserted—on the faith of which he had induced official personages and private subscribers to act for his benefit; and to deny which now, would be a gross fraud on them as well as on the company. If he did in fact subscribe, which the evidence tended so strongly to prove, he was rightly holden. But, if the truth be, that he signed no contract, then his acts and declarations estop him from alleging that truth. Such is the genuine operation of estoppels—to exclude truth. On this ground, therefore, if not on the other, he was rightly holden.

There is not more than one other point on this record worthy of notice. It is the very desperate ground of defence assumed in the 8th proposition submitted to the court. Assuming that Graff concurred in imposing on the governor and the mayor, with false lists of subscribers and stockholders, he is not liable to the company, because the company was a party to the fraud. Such is the doctrine of this point. I will not say that it was wrong for the executrix to suggest such a ground of defence; but, I persuade myself, that if Graff himself were here he would shrink from it. As an honest man, he could not stand upon it an instant. If the plaintiffs were a party to such a fraud, he made them so, for he represented the plaintiffs. But, if the subscription were feigned and fraudulent, the subscriber, actual or pretended, is still bound to comply with all the terms and responsibilities imposed upon him in the same manner as if he were a *bonâ fide* subscriber. By STORY, J., in Miner v. The Bank of Alexandria, 1 *Peters* 65, the law will not make the subscription itself a nullity, though it

will deprive the fraudulent subscriber of its advantages. There is reason for this principle. A subscription to a joint stock is not only an undertaking to the company, but with all other subscribers. Such contracts are trilateral, and even if fraudulent as ,between two of the parties, they are to be enforced for the benefit of the third.

But it is a mistake to speak of the company as a party to the fraud conceived of in the 8th point. If there was such a fraud, the company was rather a victim of it than a *particeps.* Her corporate name, her charter, her character, were used by the very party in behalf of whom this extraordinary defence is set up. The company alleges no fraud, but rather an honest subscription. There is no proof of fraud, and there is abundant evidence of a subscription. An allegation of that which were worse than Punic faith, is not a defence to such a contract, nor ground to justify the repudiation of it.

On a review of the whole record, we perceive no error in it, and accordingly the judgment is affirmed.